**ROBERT E. DERECKTOR OF RHODE ISLAND, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant,**

**Bollinger Machine Shop and Shipyard, Inc., Defendant-Intervenor.**

**Civ. A. No. 90–0453B.**

United States District Court, D. Rhode Island.

April 24, 1991.

Frederick W. Claybrook, Jr., Crowell & Moring, Washington, D.C., and Christopher H. Little, Tillinghast, Collins & Graham, Providence, R.I., for plaintiff Robert E. Derecktor of Rhode Island, Inc.

George P. Williams, Office of the Gen. Counsel, U.S. Dept. of Navy, Washington, D.C., and Everett C. Sammartino, Sr. Asst. U.S. Atty., Providence, R.I., for defendant U.S.

Marcus B. Slater, Fort & Schlefer, Washington, D.C., and Charles J. McGovern, McGovern, Noel, Falk, Pannone, Procaccini & O'Leary, Ltd., Providence, R.I., for defendant–intervenor Bollinger Machine Shop.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

This is an action under the Administrative Procedure Act, 5 U.S.C. § 706 (1988), to set aside a contract to build fast patrol craft awarded by the United States of America to defendant-intervenor Bollinger Machine Shop and Shipyard, Inc. (Bollinger). Plaintiff Robert E. Derecktor of Rhode Island, Inc. (Derecktor), as a disappointed bidder, contends that the contract should not have been awarded to Bollinger. Derecktor claims that Bollinger's boat, as proposed, did not meet the 35 knot speed requirement of the procurement, and that the award to Bollinger is void *ab initio* because it was tainted by a felonious violation of the Ethics in Government Act, 18 U.S.C. § 207 (1988), and a violation of Department of Defense Directive 5500.7. There are other complaints which are also dealt with.

This is not a situation in which the low and responsible bidder is to be awarded the contract. Congress has left to the Navy the determination of which offeror best meets the needs of the Navy. Thus, in this solicitation, the Navy is free to acquire a more expensive boat if the Navy deems it to best serve the national defense, and the boat is found to provide the best overall value among the offerors. *See* 10 U.S.C. §§ 2304, 2305 (1988). The Court finds that the Navy reasonably determined that Bollinger's boat offered the best value to the government and that no violation of statutes or regulations occurred. The Court must accordingly enter judgment for defendant and defendant-intervenor.

## CROW'S NEST VIEW OF THE PROCUREMENT

The United States Navy has a need to replace its aging fleet of fast patrol craft.

The Navy needs patrol craft capable of operating at high speeds for long periods of time, and able to operate in shallow water in order to deliver Navy SEALS to shore. Similar craft are also needed to perform shoreline interdiction of suspected drug smugglers. Congress has appropriated funds to purchase the boats, and in early September of 1988, the Navy began the process of procurement. The procurement was designated as the "Coastal Patrol Boat Program," and referred to as the "PBC Program." The government office responsible for administering the Coastal Patrol Boat Program is PMS 300. PMS 300 is located at the Naval Sea Systems Command (NAVSEA) in Crystal City, Virginia.

The Chief of Naval Operations, with the assistance of PMS 300, developed the operational requirements of the boat, in a classified "Letter of Operational Requirements."[1] PMS 300 formulated the procurement strategy and developed the boat's technical specifications in accord with the Letter of Operational Requirements. The Navy did not design the boat, but required offerors to design proposed craft which would meet the Navy's mission requirements.

NAVSEA first publicly announced its program to purchase patrol boats by a publication in the *Commerce Business Daily* on December 1, 1988 and did so again on March 16, 1989. In response, NAVSEA received statements of interest from hopeful contractors. On March 31, 1989, the Navy issued a Request for Proposals to interested contractors. The Request for Proposals contains the basic procedures and requirements for proposals and award of the Coastal Patrol Boat contract, and included a Circular of Requirements and Top Level Specifications. These attachments described the technical specifications each boat was required to meet—including the 35 knot speed requirement.

NAVSEA also strongly encouraged bidders to include "Non–Developmental Items" in their proposed craft. Non–Developmental Items are components which are already available in the existing market, and which do not require significant technical development. The use of Non–Developmental Items is important because it helps the Navy evaluate on paper whether a proposed craft will function correctly, saves contractors time and effort in the design process, and permits prompt replacement of defective parts. The method contractors use to incorporate Non–Developmental Items begins with identifying a "parent craft" to use as a model for their proposed boat. A parent craft is an existing boat which can meet all of the Navy's requirements with little modification. Congress has recognized the advantages of using Non–Developmental Items, and declared that the Department of Defense use these items to the maximum extent practicable. 10 U.S.C. § 2325 (1988).

The procurement plan for the Coastal Patrol Boats involved two separate steps. The boat designs, as submitted by offerors, were first evaluated to determine whether the craft could meet the mandatory technical and management requirements of the Circular of Requirements and the Top Level Specifications.[2] Then, if these requirements were met, the offeror was asked to submit a price proposal. If, however, the Navy found that a proposed boat could not meet the mandatory criteria of the Circular of Requirements and the Top Level Specifications, the Navy was obliged to disqualify the offeror, and not permit submission of a price proposal.

When PMS 300 received proposals, the Technical Evaluation Review Panel evaluated each bidder's Technical/Management design. This panel was composed of PMS 300 engineers and technical experts with experience in procuring patrol craft. These individuals reviewed the submissions, and in some instances made calcula-

---

1. Draft Letters of Operational Requirements were circulated through PMS 300 in September of 1988, and suggested changes were provided to the Chief of Naval Operations.

2. The bidders were required to submit sufficient calculations and supporting documentation to enable the Navy to evaluate each proposal.

tions to determine whether the proposed boats would meet the Technical/Management requirements of the Circular of Requirements. The Technical Award Review Panel would then report its findings to the Contract Award Review Panel. The Contract Award Review Panel was staffed by senior PMS 300 employees with substantial experience in Navy patrol boat procurement.

After briefing from the Technical Award Review Panel, if the Contract Award Review Panel found the offerors' initial proposals deficient, "discussion questions" were sent to the offerors, notifying them of their individual deficiencies and giving them an opportunity to revise their proposals. Several sets of discussion questions were sent to offerors during the procurement process. It was also the practice of PMS 300 employees to meet with offerors to discuss deficiencies in their proposals. In response to these discussion questions, offerors usually revised their proposals to satisfy the Navy's concerns. On March 1, 1990, the Navy decided that no further discussion on the Technical/Management proposals would occur. The Navy's final review of the Technical/Management proposals began.

The Technical Award Review Panel again reviewed the designs and reported its findings and recommendations regarding the acceptability of each proposal to the Contract Award Review Panel. The Technical/Management evaluation was expressed in a numerical score for different categories and sub-categories. In the final analysis, the Technical Award Review Panel found the proposals of Derecktor and Bollinger, among others, to be acceptable. After the rejection of unacceptable Technical/Management proposals, price proposals were requested from the remaining offerors, including Derecktor and Bollinger. The Price Review Panel evaluated each price proposal and briefed the Contract Award Review Panel.

Armed with this information, the Contract Award Review Panel recommended to the Source Selection Authority, Stephen Piasecki, that Bollinger be awarded the contract because it offered the best value to the Navy, despite the fact that Bollinger's boat cost more money. As the Source Selection Authority, Piasecki was responsible for deciding which offeror would be awarded the Coastal Patrol Boat contract. After considering the Navy's mission needs, and concluding that Bollinger's boat did in fact provide the best value to the Navy, Piasecki awarded the contract to Bollinger.

## STANDARD OF REVIEW

 In order to set aside a government contract, disappointed offerors bear a heavy burden. A Court does not review procurement decisions to determine whether government officials made a mistake. The test is whether the government's decision "either had no rational basis or involved a clear and prejudicial violation of applicable statutes or regulations." *Saco Defense Sys. Div. v. Weinberger*, 806 F.2d 308, 310–11 (1st Cir.1986). Where an agency's decision is highly technical, and specialized knowledge is required, judicial deference is necessary. *Rhode Island Higher Education Assistance Authority v. U.S. Dept. of Education*, 929 F.2d 844, 856–57 (1st Cir.1991); *Steinthal & Co. v. Seaman's*, 455 F.2d 1289, 1301 (D.C.Cir.1971). Thus, the authority of the Court to review the government's decision is narrow at best.

## SPEED OF BOLLINGER'S BOAT

 Derecktor claims that Bollinger's proposal should have been jettisoned at the Technical/Management level and Bollinger prohibited from submitting a price proposal because Bollinger's boat, as proposed, could not meet the speed requirement of the Circular of Requirements, which specified that the craft must be able to attain a speed of 35 knots in Sea State 1.[3] This dispute revolves around Bollinger's propeller selection which caused significant discomfort to the Technical Award Review

---

**3.** The "Sea State" number measures turbulence of the sea. In situations where the sea is extremely rough, a craft needs extra power to attain a required speed.

Panel. The Navy engineers repeatedly found that Bollinger's propeller, as proposed, would not absorb sufficient thrust to achieve the required speed because the phenomenon of cavitation would result in thrust breakdown.[4] The Technical Award Review Panel initially believed that this deficiency violated the 35 knot speed requirement of the Circular of Requirements. As a result, the Navy submitted discussion questions to Bollinger, stating that its propeller selection would not permit the boat to make the required speed. In response to these discussion questions, Bollinger's last Technical/Management proposal contained a slight change in propeller parameters. Bollinger also stated that cavitation tests would be performed during the detail design phase. Bollinger pointed out that the parent craft's propeller, which was slightly different, allowed the heavier parent craft to attain a speed well in excess of the required speed for the Coastal Patrol Boat Program.[5]

After reviewing this final proposal, the Technical Evaluation Review Panel was still concerned about whether Bollinger's boat could attain 35 knots in Sea State 1. Two members of the Panel stated at a March 14, 1990 briefing to the Contract Award Review Panel that Bollinger's proposal was unacceptable due to the propeller deficiency. At a Contract Award Review Panel briefing on March 20, 1990, two members suggested that Bollinger be disqualified for failing to make the required speed. The Chairman of the Contract Award Review Panel, Captain Harley Oien, stated that Bollinger's proposal was "ok" and that the propeller problem could be easily solved at the builder's trials. It was also suggested that the previous report of the Technical Award review Panel, which stated that Bollinger's propeller deficiency violated the Circular of Requirements, should be revisited.

On March 22, 1990, the Technical Award Review Panel issued a report to the Contract Award Review Panel, concluding that Bollinger's propeller deficiency created "little technical risk" of the boat not making speed, and therefore did not violate the Circular of Requirements. The Technical Award Review Panel explained this conclusion to the Contract Award Review Panel as follows:

> [T]he offeror makes reference to the parent craft and Island Class, full scale testing and cavitation tunnel testing. The [Technical Award Review Panel] reevaluated the proposal which addresses the initial propeller selection and determined the offeror's approach of performing lifting line and lifting surface calculations as well as cavitation tunnel tests to determine the final design substantially mitigates the risk associated with the craft's performance. The [Coastal Patrol Boat] has more than adequate power available to meet the speed requirement even if there is a drop in propeller efficiency. Additionally, the parent craft has a demonstrated performance capability of 40 knots at a displacement of 290 + LT. In summary, the offeror has proposed an approach which will identify and cure any propeller design deficiencies during the detail design phase without a significant impact on the design and there is a full scale proven solution in the form of the parent craft propeller. The [Technical Award Review Panel] estimates that the final propeller solution will be bounded by the current design and the parent craft design.[6]

The Contract Award Review Panel agreed with the Technical Award Review Panel's reasoning, and concluded that Bollinger's proposal was acceptable.

Derecktor maintains that the Navy was required to disqualify Bollinger because the Technical Award Review Panel found that if Bollinger's proposed propeller was

---

4. Cavitation occurs when a propeller is moving so quickly that an air pocket develops behind the propeller. Excessive cavitation results in thrust breakdown because the air pocket inhibits water flow behind the propeller, preventing the boat's forward acceleration.

5. Bollinger's boat is modeled after a craft currently used by the Egyptian Navy which exceeds the Navy's speed requirement.

6. For purposes of clarity, the bracketed names replace initials in the original document.

built exactly as proposed it would not absorb sufficient thrust to attain 35 knots in Sea State 1. The Navy and Bollinger counter that both the Technical Award Review Panel and the Contract Award Review Panel found that Bollinger's amended proposal, which promised cavitation tests and referred to the parent craft's speed, enabled the Technical Award Review Panel and Contract Award Review Panel to reasonably conclude that Bollinger's proposal was acceptable, and that the final propeller design could be appropriately developed during the detail design phase. The Navy and Bollinger also stress that each offeror was required to submit a "design process," and not a finished product.

Persuasive evidence was introduced that propeller design is one of the last considerations in the detail design and manufacture of boats. This is because minor changes in trim or even paint on the side of a boat can alter a craft's resistance, requiring an unforeseeable modification in propeller design. Speed is further affected by minor changes in weight distribution, requiring some modification of a propeller's shape or size.

In the final analysis, the determination of whether a proposed vessel can achieve a certain speed involves technical judgment; there is no guarantee that any boat will meet a certain speed until it is built. It was reasonable for the Navy to find that the parent craft's propeller could be substituted without any significant effect on contract compliance, and it was reasonable to conclude that the parent craft's propeller will permit Bollinger's boat to meet the speed requirement. The Navy found Bollinger's proposal acceptable because it posed little technical risk of not making the required speed. This was not unreasonable or violative of law.

The Request for Proposals required Bollinger to submit sufficient documentation to determine whether the boat could make speed. No prototype was required. Although Bollinger could have submitted additional documentation in support of its proposal, or used the exact propeller as in the parent craft, it was not irrational or violative of law for the Navy to conclude that Bollinger adequately explained how its boat would meet the speed requirement.

■ Further, the Contract Award Review Panel and Source Selection Authority had the right to reject any misgivings the Technical Award Review Panel had regarding Bollinger's propeller deficiency and whether it violated the Circular of Requirements. *See BMY, A Division of Harsco Corp. v. United States*, 693 F.Supp. 1232, 1247 (D.D.C.1988); *Prudential–Maryland Joint Venture Co. v. Lehman*, 590 F.Supp. 1390, 1407 (D.D.C.1984). The Technical Award Review Panel scored Bollinger's Technical/Management proposal highest among all bidders, despite subtracting points for the propeller deficiency. In these circumstances, it cannot be said that the Navy's decision had no rational basis or that its determination involved a clear and prejudicial violation of applicable statutes or regulations.

### ETHICS IN GOVERNMENT ACT

■ The next argument in Derecktor's armada is that the award to Bollinger is void *ab initio* because it is tainted with a criminal violation of the Ethics in Government Act, 18 U.S.C. § 207 (1988). This accusation involves one Carl A. Onesty, whose voyage through the "revolving door" landed him in a consultant position with Bollinger shortly after retiring from NAVSEA.

Onesty was employed by the Navy for twenty years. From 1986 until August 31, 1988, Onesty held the position of Deputy Project Manager of PMS 300. From September 1, 1988 until his retirement on December 31, 1988, Onesty was the Special Assistant to the Project Manager at PMS 300. He also served as Acting Deputy Program Manager from September 1, 1988 until mid-December of 1988. Employees of PMS 300 administered the Coastal Patrol Boat Program from its inception in the Fall of 1988 until the present. Onesty had official responsibility for the Coastal Patrol Boat Program while employed at PMS 300, although he unsuccessfully attempted to distance himself from that program be-

cause of disagreements with Captain Harley M. Oien, the Program Manager of PMS 300, regarding Coastal Patrol Boat procurement strategy. Onesty's job description makes clear that he was the "senior civilian counterpart to the Program Manager," and "responsible for all aspects of the management of Combatant Craft...." Pl.Ex. 17. Onesty, as the Acting Deputy Program Manager was the "alter-ego" of the Project Manager, and responsible for all procurements at PMS 300.

Onesty was also personally involved in the Coastal Patrol Boat Program. Several "business sensitive" documents relating to the Coastal Patrol Boat Program contained Onesty's initials on the routing sheets. Onesty also made written comments on at least two business sensitive documents: a draft acquisition strategy which identified Bollinger as a potential contractor, and a draft Letter of Operational Requirements. In a draft source selection plan dated December 14, 1988, Onesty was designated as a member of the Coastal Patrol Boat Program Contract Award Review Panel. Pl.Ex. 37 at 13. Onesty did not at any time, however, participate as a member of the Contract Award Review Panel.

On December 31, 1988, Onesty retired from NAVSEA. Before his retirement, however, several contractors had sent letters of interest in response to the Navy's Coastal Patrol Boat Program announcement in the *Commerce Business Daily* on December 1, 1988. The actual Request for Proposals issued on March 31, 1989, three months after Onesty's retirement.

On April 3, 1989, three days after the Request for Proposals issued, Onesty came on board with Bollinger to prepare the company's Coastal Patrol Boat proposal. Shortly thereafter, Mr. Mark Stanley, a vice-president of Bollinger, called Captain Oien to inform him that Onesty was working on Bollinger's Coastal Patrol Boat proposal. Stanley asked Oien if he had a problem with Onesty working for Bollinger on its proposal. Oien said he did not.

Onesty obviously provided substantial assistance to Bollinger on its Coastal Patrol Boat proposal, and advised Bollinger how to respond to discussion questions. In addition, on at least four occasions, Onesty physically delivered Bollinger's proposals (including Bollinger's best and final offer) to the Industrial Liaison Office at NAVSEA, located in the same building as PMS 300.[7] There is no evidence that Onesty delivered Bollinger's proposals with the intent to influence. Nonetheless, NAVSEA employees responsible for the Coastal Patrol Boat Program knew Onesty worked for Bollinger and that he was delivering Bollinger's proposals.[8]

Derecktor asserts that Onesty violated the Ethics in Government Act by physically delivering Bollinger's proposals to NAVSEA, and for that reason this Court should set aside the contract. In support, Derecktor cites *United States v. Mississippi Valley Co.*, 364 U.S. 520, 563–66, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), and *TRW Environmental Safety Services, Inc. v. United States*, 18 Cl.Ct. 33, 67 (1989). In *Mississippi Valley*, the Supreme Court permitted the United States Government to rescind a contract tainted with criminal conflicts of interest. The case did not consider whether a disappointed bidder could void such a contract when the government opposes rescission.

In *TRW*, the Claims Court set aside a nuclear waste disposal contract at the behest of a disappointed bidder because the government official who awarded the contract violated a conflict of interest statute. The court found *Mississippi Valley* applicable, reasoning that:

> where there occurs within the federal procurement process a violation of a conflict of interest statute, which exists for the purpose of protecting the very integrity of that process, any contract arising

---

7. NAVSEA procedures require proposals to be delivered to the Industrial Liaison Office.

8. Mr. Jeffery Thrasher, a non-voting member of the Contract Award Review Panel, made a point of telling PMS 300 employees responsible for the Coastal Patrol Boat Program that Onesty was delivering Bollinger's proposal. It is unclear how Thrasher knew this.

from such tainted process must be disaffirmed.

The court finds this to be so, despite the fact that in *Mississippi Valley* it was the government, not an unsuccessful bidder, that attempted to disaffirm the contract.... To find that the interest of the public, the rights of the competing bidders, and the integrity of the federal procurement process can be ignored simply because DOE chooses, in this instance, to do so would be senseless and self-defeating.

*TRW*, 18 Cl.Ct. at 67. Despite its expansive language, *TRW* simply holds that a Court may set aside a government contract if the government employee responsible for awarding the contract has a clear conflict of interest.

Derecktor, however, does not contend that a NAVSEA employee responsible for evaluating Coastal Patrol Boat offers labored under a conflict of interest. Instead, Onesty, a former government employee, is the target of Derecktor's torpedoes. This is a substantial expansion of *TRW* because Derecktor seeks to void the award because of alleged misconduct by the successful bidder's employee. The argument is that the contract should be set aside because Bollinger's offer was fatally infected with illegality.

Derecktor, however, is not able to demonstrate a clear and prejudicial violation of the Ethics in Government Act.

The analysis begins with the relevant portion of the Ethics in Government Act which provides that:

Whoever, [having been an officer or employee of the executive branch of the United States Government] within two years after his employment has ceased, knowingly acts as agent or attorney for, or otherwise represents, any other person (except the United States), in any formal or informal appearance before ...

(1) any department ... of the United States ... or any officer of employee thereof, and

(2) in connection with any ... contract ... or other particular matter involving a specific party of parties in which the United States ... is a party or has a direct and substantial interest, and

(3) ... which was actually pending under his official responsibility as an officer or employee within a period of one year prior to the termination of such responsibility ...

shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

18 U.S.C. § 207(b) (1988).[9]

The elements of the offense are succinctly stated in *United States v. Coleman*, 805 F.2d 474, 478 (3rd Cir.1986). Minimally, they are (1) that the defendant was employed by the United States Government; (2) that within two years from the termination of his employment, defendant knowingly acted as an agent for or represented another in an "informal appearance" before his former agency or employees thereof; (3) that the representation was in connection with a particular matter involving a particular party in which the United States had a direct and substantial interest; (4) that the defendant had official responsibility for the particular matter within one year from his retirement from government service; and (5) that the representation was knowing.

It is undisputed that Onesty was a government employee at PMS 300, NAVSEA, and that Onesty knowingly acted as an agent or representative of Bollinger within two years of his retirement from NAVSEA. Onesty knew he was working for Bollinger when he physically delivered

9. Derecktor also argues that Onesty violated 18 U.S.C. § 207(a). This section contains the same prohibitions as § 207(b) except that former government employees are barred for life from re-appearing before their former agency, where the former employee participated personally and substantially in the matter during government service. Because Onesty had official responsibility for the PBC Program, and because the outcome under § 207(b) is equally applicable to § 207(a), discussion of § 207(a) is omitted.

On January 1, 1991, substantial amendments to the Ethics in Government Act went into effect. These amendments are not applicable here.

its bid proposals to NAVSEA. The dispute is whether, by personally delivering Bollinger's bids to the Industrial Liaison Office at NAVSEA, Onesty knowingly made an "appearance" as a representative of Bollinger before NAVSEA within the meaning of the Ethics in Government Act.

Derecktor cites the applicable regulation which defines "appearance": "An appearance occurs when an individual is physically present before the United States in either a formal or informal setting or conveys material to the United States in connection with a formal proceeding or application." 5 C.F.R. § 737.5(b)(3) (1989).[10] Thus, Derecktor argues, physical presence alone constitutes an appearance. The Navy and Bollinger assert that an appearance requires presence in a professional capacity and that Onesty was acting as a mere messenger when he delivered Bollinger's proposals to NAVSEA. The evidence clearly shows that Onesty was in fact acting as a messenger.

A defendant must appear in a professional capacity in order to violate 18 U.S.C. § 207(b) (1988). *See* H.R.Conf.Rep. 1756, 95th Cong., 2d Sess. 74, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4216, 4390. Since Onesty only appeared as a messenger, he did not violate the Ethics in Government Act.

Moreover, the Ethics in Government Act provides in part that:

the prohibitions of subsections (a), (b), and (c) shall not apply with respect to the making of communications solely for the purpose of furnishing scientific or technological information under procedures acceptable to the department or agency concerned....

■ 18 U.S.C. § 207(f) (1988). The regulatory interpretation of 18 U.S.C. § 207(f) states in part that "[n]o violation occurs when, for example, a former Government employee working on a project makes contact to determine the kind and form of information required, or the adequacy of information already supplied, so long as

agency procedures are satisfied." 5 C.F.R. § 737.15(a) (1989). The example which follows states that a former Government employee who would otherwise be prohibited from doing so, may "meet with Government technical experts" to furnish technical information. *Id.* (example 1). It is also clear from 5 C.F.R. § 737.5(c)(2) (example 2) (1989), that:

A Government employee, who has worked for years on the design of a new satellite communications system, joins C Company. Later, the Government issues a "request for proposals" ("rfp") to construct the new system, which is circulated generally to industry. The employee proposes to act as C Company's representative in connection with its anticipated proposals for the contract. He may do so. The satellite contract became a particular matter when the rfp was being formulated; it would ordinarily not become one involving a specific party or parties until initial proposals or indications of interest therein by contractors were first received. Moreover, if the employee's work for C Company were limited to the formulation and communication of a proposal in response to the rfp, it would not be prohibited to the extent it involved a communication for the purpose of furnishing scientific or technological information to the Government....

5 C.F.R. § 737.5(c)(2) (example 2) (1989). The question, then, is whether Onesty, by physically delivering Bollinger's proposal to NAVSEA, was communicating solely for the purpose of furnishing technological information to the Government. This Court finds that he was.

Onesty's delivery of Bollinger's proposal was no more than a communication of technological information under § 207(f). Further, Onesty did not deliver Bollinger's proposals with intent to influence. *See* 5 C.F.R. § 737.17(c) (1989) ("The furnishing of meritorious or convincing scientific or technological proposals does not constitute

---

**10.** These regulations interpreting the Ethics in Government Act are now found at 5 C.F.R. § 2637 *et seq* (1990). The cited regulations were in effect when Onesty went to work for Bollinger and when Onesty delivered Bollinger's proposals to NAVSEA.

an intent to influence"). Onesty's mission was to make absolutely certain that Bollinger's proposal was delivered to the right place and at the right time. Onesty also followed NAVSEA procedures which require proposals to be delivered to the Industrial Liaison Office. Therefore, Onesty's delivery of Bollinger's proposals to NAVSEA is within the exemption of 18 U.S.C. § 207(f) (1988). Derecktor has failed to prove a clear and prejudicial violation of the Ethics in Government Act.

## DEPARTMENT OF DEFENSE DIRECTIVE 5500.7

██ Derecktor's next argument is that the contract must be set aside because Onesty violated Department of Defense Directive 5500.7, 32 C.F.R. § 40.4(b)(2) (1989) by using "inside information" while preparing Bollinger's proposal. This regulation provides that:

> DoD personnel shall not engage in any personal, business, or professional activity, nor enter into any financial transaction that involves the direct or indirect use of "inside information" for personal advantage to themselves or others. This prohibition against "inside information" obtained while at the Department of Defense continues even after the individual terminates Government service or employment.

Inside information is defined as "[i]nformation generally not available to the public and obtained by reason of one's official DoD duties or position". 32 C.F.R. § 40.3 (1989).

Derecktor introduced several Coastal Patrol Boat Program documents which contained inside information and had been routed to Onesty. Two of those documents, a draft Acquisition Strategy and a draft Letter of Operational Requirements had Onesty's written comments. Essentially all the information contained in these documents later became public in the Request for Proposals and before Bollinger retained Onesty.

The only information in Onesty's possession not disclosed in the Request for Proposals was technical and schedule risk identification, and potential contractors in the draft Acquisition Strategy (Pl.Ex. 13); the names of the Technical Award Review Panel and Contract Award Review Panel members (Pl.Ex. 37 at 13); and certain classified information in the draft Letter of Operational Requirements. The Navy offered compelling testimony that the undisclosed information in the Request for Proposals would not provide a contractor with a competitive advantage.

The Navy further maintains that violation of a conflict of interest regulation is insufficient to set aside a government contract. It relies on *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1581 (D.C. Cir.1983). In *CACI*, a government employee allegedly violated a regulation requiring the avoidance of an appearance of impropriety. The court declined to set aside the contract, reasoning that the regulation "merely provides general standards to guide government employees.... It does not create specific and precise standards, the violation of which would justify enjoining the Department from awarding a contract." *Id.*

The Comptroller General, in deciding bid protests has determined that the use of inside information justifies termination of a contract.[11] In *Litton Systems, Inc.*, 68 Comp.Gen. 422 (1989), *aff'd sub nom., The Department of the Air Force—Request for Reconsideration*, 68 Comp.Gen. 677 (1989), the Comptroller General sustained Litton's protest for a contract to supply advanced radar warning receivers. Litton protested after learning that investigators from "Operation Ill Wind," a criminal inquiry into pervasive procurement fraud, were investigating the contract. It was then disclosed that the Deputy Assistant Secretary of Acquisition for Tactical Systems provided a substantial portion of Litton's proposal to a person who later sold

---

**11.** The Comptroller General may recommend the termination of a government contract if the procuring agency fails to comply with applicable statutes and regulations. 31 U.S.C. § 3554(b)(1) (1988). If the agency does not follow the Comptroller General's recommendation, Congress must be notified. 31 U.S.C. § 3554(e)(2) (1988).

the information to Litton's competitor. There is no such evidence in this matter.

In *Holmes and Narver Services, Inc./Morrison–Knudson Services, Inc., a joint venture; Pan Am World Services, Inc.*, B–235906; B–235906.2 (WESTLAW, Government Contracts–Comptroller General Database) (October 26, 1989), *aff'd sub nom., Brown Associates Management Services, Inc.—Request for Reconsideration*, B–235906.3 (WESTLAW, Government Contracts–Comptroller General Database) (March 16, 1990), an Army Colonel had access to an Acquisition Plan, and reviewed a draft Source Selection Plan. He then left government service to work for the ultimately successful bidder. The Comptroller General sustained the protest, reasoning that the award was based on an unfair competitive advantage. There is no such evidence of unfair competitive advantage in this case. Here, Onesty's Naval career ended before significant aspects of the procurement process began.

Further, there is no evidence that the undisclosed information in Onesty's possession could cause or did cause any prejudice to Derecktor or provide significant aid to Bollinger. Therefore, the contract cannot be set aside.

## FLOTSAM AND JETSAM

■ Derecktor's final contention is that the Navy unlawfully slanted the evaluation process in Bollinger's favor, in essence, because of Onesty's influence. These allegations involve (1) the length of Bollinger's boat; (2) technical scoring of Non–Developmental Items; (3) life-cycle costs; and (4) technical/price weightings.

Derecktor claims that the Navy should not have accepted Bollinger's proposal because its boat was too long. Bollinger proposed a boat of 170 feet, whereas Derecktor proposed a boat of 143 feet. Although the announcement in the *Commerce Business Daily* stated that the anticipated length of the craft would be 110–140 feet, the announcement also stated that there was "no specified requirement for length." The Request for Proposals did not contain a length requirement. This argument sinks.

Derecktor also complains that the Navy improperly concluded that Bollinger's gearbox was a Non–Developmental Item. Although Bollinger's proposed gearbox is not identical to the parent gearbox, a Non–Developmental Item is not required to be an exact duplicate. The fact that Bollinger's proposed gearbox used an alloy and a trolling valve did not render the gearbox Developmental. Credible evidence was introduced that the alloy gearbox is used in ferry boats, and that the trolling valve is used in fishing vessels to attain the steady slow speed that fishing enthusiasts fancy. The Navy rationally concluded that Bollinger's gearbox was a Non–Developmental Item. Further, Derecktor has neglected to demonstrate prejudice resulting from any erroneous decision that Bollinger's gearbox was a Non–Developmental Item.

In amendment 12 to the Request for Proposals the Navy deleted life-cycle costs as a factor in the Price Proposal Category. Derecktor contends that this was done for the benefit of Bollinger. The Navy, however, believed that life-cycle cost was a "bogus" factor because of the difficulty in assessing the nature and extent of future operations. All offerors were given adequate time to revise their proposals in response to this amendment. The action was not irrational and no violation of statute or regulation occurred.

After the deletion of life-cycle costs as a factor in the Price Proposal Category, the Contract Award Review Panel necessarily changed the relative weightings between the Price and Technical/Management Categories. It added 4% to the Technical/Management Category in which Bollinger excelled. Derecktor claims that this was done to assist Bollinger. This is simply baseless speculation on Derecktor's part.

The gist of these claims, as well as the speed claim, is that the Navy slanted the award criteria to favor Bollinger as a result of Onesty's improper influence. The fact is that there is no basis to conclude that any of these actions resulted from favorit-

**1030**

ism toward Bollinger. Although the Court is not unsympathetic to Derecktor's difficulties in demonstrating an improper intent by the Navy, the contract cannot be set aside without proof. There is none.

This Court cannot disturb the award because of the potential economic consequences to Derecktor and its employees. Derecktor must establish a legal basis to obtain relief. It has failed.

Judgment for defendant and defendant-intervenor.