DECISION
This matter is before the Court for a decision relative to the transfer of Mr. Irving Briggs, (Respondent), from the Forensic Unit of the Eleanor Slater Hospital, (Forensic Unit), where he had been receiving specialized mental health services, back to the Adult Correctional Institutions, (ACI), where he was previously incarcerated. The Director of the Department of Corrections does not object to the instant petition.[1] Respondent is represented by the Mental Health Advocate, [2] who vigorously objects to the instant petition.
 Factual Background and Procedural History
Respondent was convicted of three counts of First Degree Sexual Assault after a jury-waived trial concluding on October 3, 2006. He was sentenced to 60 years on each *Page 2 
count. While incarcerated at the ACI, Respondent was evaluated by Dr. Jody Underwood on September 18, 2009. In Dr. Underwood's opinion, Respondent was suffering from a psychiatric illness, which, at that time, included symptoms of major depressive disorder with psychotic features as well as post traumatic stress disorder and generalized anxiety disorder. In addition, he carried, at that time, the diagnoses of anti-social and borderline personality disorder with a history of non-suicidal self-injurious behaviors. Dr. Underwood further gave the opinion that given Respondent's depressive state and suicidal intent at that time, the therapeutic setting of a psychiatric hospital, rather than the punitive setting of the ACI, was needed to treat Respondent, and, Respondent's mental illness was of such a nature, at that time, as to create the need for immediate transfer to the Eleanor Slater Hospital Forensic Unit (ESH) for emergency treatment and examination.[3] A letter from, and an affidavit of Dr. Underwood were attached to the petition detailing that Respondent was, at that time, displaying symptoms of major depression with active suicidal ideation and intent, and within a week previous to the petition, Respondent had a serious attempt with the specific intent of ending his life. Dr. Underwood's affidavit indicated that Respondent was in need of service beyond what was available at the ACI, and, if Respondent remained untreated, or under treated, Respondent would remain dangerous to himself and he would be unable to function in a correctional setting.
Respondent was thereafter transferred to the Forensic Unit for further treatment by Order of the Court dated September 24, 2009.[4] The certification contained on the face of said Order indicated that it was sent to the Mental Health Advocate by fax and first *Page 3 
class mail on September 24, 2009. The Order indicated that the matter would be reviewed on November 5, 2009. The Mental Health Advocate did not object to this transfer.
On Monday, November 2, 2009, the Rhode Island Department of Mental Health, Retardation Hospitals (MHRH) brought an emergency oral motion before the Superior Court. MHRH attorneys brought a typewritten letter dated November 2, 2009, addressed to the Mental Health Advocate, expressly stating Respondent's "continued presence at the Forensic Unit of ESH presents a clear health and safety risk to the other patients and staff on the ward." The letter also indicated that MHRH had assessed Respondent and determined that he did not require the specialized psychiatric services at the Forensic Unit, and further, that the Department of Corrections agreed with the MHRH assessment.[5] The letter was signed by Jane E. Morgan, Esq., Associate Director, OHHS.[6] At the argument on the emergency motion conducted on November 2, 2009, there were representations made by MHRH that Respondent was a "significant danger to the patients in the forensic unit and also to the staff,"[7] among other representations. After hearing arguments, the Court articulated a concern about the harm that might result to both the Respondent, as well as to others, as a result of selecting either of the two choices advocated to the Court.[8] Regrettably, this Court did not immediately apply the provisions of Administrative Order 86-1, and the Court must wear the mantle of responsibility for that oversight. While Administrative Order 86-1 addresses transfers *Page 4 
made pursuant to G.L. 1956 § 40.1-5.3-6, [9] or from the ACI into the Forensic Unit, there does not appear to be any logical reason why it should not apply to transfers made pursuant to § 40.1-5.3-9[10] as well, considering that the heading of the Order specifically refers to "Procedures for examination and transfer of persons convicted and imprisoned for crime pursuant to Sections 40.1-5.3-6 et seq., G.L. 1956 (1984 Reenactment)." Administrative Order 86-1 specifically provides:
 1. A petition filed under the provisions of Section 40.1-5.3-6 shall be assigned for hearing to the daily criminal calendar. Any justice of the Superior Court may order the examination provided for in said section and set the petition for hearing to a date certain on the daily criminal calendar.
 2. In the event that the mental illness of an inmate creates a need for emergency treatment, such petition shall include a request for immediate transfer to the facility provided for in Section 40.1-5.3-1 for emergency treatment and examination. An order granting such a petition shall set the petition for hearing to a date certain on the daily criminal calendar to determine whether the inmate should continue to be confined at the facility provided for in Section 40.1-5.3-1 or should be returned to the facility from which he was transferred.
 3. A petition for immediate transfer for emergency treatment and examination shall be accompanied, wherever possible, by the affidavit of a psychiatrist setting forth the need for such immediate transfer.
 4. Where an acute emergency exists and (a) no justice of the Superior Court is available to respond to the petition required by section 40.1-5.3-6 or (b) the petition required by section 40.1-5.3-6 cannot be prepared in time, the inmate may be transferred because of such emergency to the facility provided for in section 40.1-5.3-1 upon the affidavit of a *Page 5 
psychiatrist setting forth that such a transfer is essential in the light of imminent peril of bodily harm to the inmate or to other individuals within the facility in which the inmate is confined. As soon as possible after such emergency transfer, a petition required by Section 40.1-5.3-6 shall be filed which said petition shall recite that the emergency transfer has taken place and whether further treatment or examination is necessary thereby requiring further confinement in the facility provided for in Section 40.1-5.3-1. An order granting a petition for further confinement shall set the petition for hearing to a date certain on the daily criminal calendar to determine whether the inmate should continue to be confined at the facility provided for in Section 40.1-5.3-1 or should be returned to the facility from which he was transferred.
The petition requirements described in paragraph 2 of Administrative Order 86-1 were not present on November 2, 2009, and no affidavit accompanied what has been described up to this point as an emergency motion to transfer Respondent back to the ACI. Furthermore, assuming without deciding that an acute emergency[11] existed on November 2, 2009, there was no affidavit of a psychiatrist setting forth that such transfer was "essential in light of imminent peril of bodily harm to the inmate or to other individuals within the facility in which the inmate is confined." See paragraph 4 of Administrative Order 86-1.
After considering the potential harm to both Respondent and others given the choices before the Court, the Court authorized the transfer citing Cleveland Board of Education v. Loudermill,470 U.S. 532 (1985) as an authority for the proposition that the full hearing might come after the transfer in the instant case was made as long as some process occurred prior to the transfer.[12]See Cleveland Board of Education v. Loudermill,470 U.S. 532, at 545. The Court, while considering the prior Superior Court Decision of In re: Rashan Muhammed,2002 WL 475279, noted that there was no *Page 6 
mention of an emergency in that prior context. This Court set a hearing date for Thursday, November 5, 2009, and indicated that a hearing would go forward on that particular date unless Respondent decided to forego the hearing.[13]
On November 5, 2009, MHRH appeared in Court ready to proceed with the hearing, but Respondent, through counsel, proceeded on a different tack.[14] Rather than proceed with the contemplated hearing, Respondent indicated that the "next item of business . . [was] to make a formal request . .[to] stay, or in the alternative, actually vacate the Order . . .[the Court] heard on Monday, transferring [Respondent] to prison."[15] Thereafter, the Mental Health Advocate began a lengthy and impassioned argument in Court laying out the precise basis for his objection as well as the legislative history, purpose and intent, and case history relative to the mental health law pertaining to the instant matter.[16] He further suggested that, after reading State v. Germane,971 A.2d 555 (R.I. 2009), the standards in Loudermill were insufficient, and, the Supreme Court, more appropriately, cited the standards from the earlier case of Mathews v. Eldredge,424 U.S. 319 (1976). Mathews employed a three-part test where three factors are to be considered in determining whether a procedure violates due process. The factors for consideration are: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative *Page 7 
burdens that the additional or substitute procedural requirement would entail. Mathews, 424 U.S. at 335. The test has been recognized in this State by our Supreme Court in the case of City ofPawtucket v. Pimental, 960 A.2d 981, 988 (R.I. 2008).[17]
Despite the test set out in Mathews, the Mental Health Advocate argued that the Court had committed an abuse of discretion and moved for Respondent's immediate return to the Forensic Unit pending a hearing.
MHRH opposed the motion and the Court took arguments under advisement. The next day, in a bench decision, the Court denied the Motion to Reconsider and declined to move Respondent back to the Forensic Unit articulating the reasons therefore in light of the three part test under Mathews. Thereafter, the Mental Health Advocate resisted the setting of a hearing date certain and requested a control date in lieu of a hearing date certain because he needed to review a significant amount of Respondent's prison record.[18] The matter was given a control date of November 23, 2009.
The parties were unable to appear on November 23, 2009, and this Court assigned this case for an evidentiary hearing on the issue of Respondent's transfer to the ACI. Due to Court constraints and commitment of counsel in other matters, the hearing proceeded sporadically, commencing December 2, 2009, and continuing on the dates of December 10, 2009; January 11, 12, 13, 15, 22, and 29, 2010, and concluding on February 5, 2010.[19] Numerous exhibits were introduced as evidence throughout the hearing. The matter was set down for a written Decision of the Court. *Page 8 
 Applicable Law
Individuals in need of specialized psychiatric services which cannot be obtained at the ACI, who have need of the specialized services available in the Forensic Unit, may be transferred pursuant to the following two specific statutes:
 § 40.1-5.3-6 Examination of persons awaiting trial or convicted and imprisoned for crime.
— On a petition of the director of the department of mental health, retardation, and hospitals, or on the petition of the director of the department of corrections, setting forth that any person awaiting trial or convicted of a crime and imprisoned for the crime in the adult correctional institutions is mentally ill and requires specialized mental health care and psychiatric in-patient services which cannot be provided in a correctional facility, a justice of the superior court may order the examination of the person as in his or her discretion he or she shall deem appropriate.
 § 40.1-5.3-7 Hearing on petition. — (a) Upon receipt of the petition and appropriate notice to the director, the attorney general and the person or his or her counsel, the court shall hold a hearing at which the parties may introduce evidence bearing on the mental condition of the person. The person who is the subject of the petition may testify, confront witnesses, and present evidence.
 (b) If the court finds by clear and convincing evidence that the person is mentally ill and requires specialized mental health care and psychiatric inpatient services which cannot be provided in a correctional facility, the court may order the transfer of the prisoner from the adult correctional institutions, to be detained in the facility provided for in § 40.1-5.3-1.
The law is not nearly as clear when the individual is no longer in need of the specialized services at the Forensic Unit and is ready to be transferred back to the ACI. There is a different section that is addressed to that particular transfer. That is:
 § 40.1-5.3-9 Return to confinement. — When any person transferred pursuant to § 40.1-5.3-7 has sufficiently recovered his or her mental health, he or she may, upon petition of the director and by order of a justice of the superior court in his or her discretion, be transferred to the place of his or her original confinement, to serve out the remainder of his or her term of sentence. *Page 9 
The casual reader will note that the right to a hearing pursuant to subsection 9 is not specifically mentioned. The precise burden of proof for the return to the ACI is another component that is absent from § 9. Further, the entire Chapter 40.1-5.3 is devoid of any reference as to how to proceed in an emergency. The only reference to an emergency in the entire chapter is contained in § 13 and the context does not specifically address transfer back and forth between the Forensic Unit and the ACI. Section 13 provides in pertinent part:
 § 40.1-5.3-13 General rights. — (a) Every person committed for care and treatment under the provisions of this chapter shall retain certain constitutional and civil rights. The exercise of these rights may be limited only for good cause, and any limitation must be promptly entered into the person's record. These rights include, but are not limited, to the following:
 * * *
 (8) To freedom from restraint or seclusion, except during an emergency; * * *
 (b) For the purposes of this section, "emergency" is defined as an imminent threat of serious bodily harm to the patient or to others. * * *
The Superior Court has granted a "Petition for Emergency Transfer" of a Defendant to the Forensic Unit in cases where neither the MHRH nor the Mental Health Advocate objected and the Petition was supported by sworn statements contained in an affidavit and a letter accompanying the Petition. See In re: Pheakiny Nem,2002 WL 475278, Decision of the Superior Court, M.P. 99-4546, dated March 11, 2002, at p. 6. In the text of the above Decision, the hearing Justice also described her earlier decision involving a consolidated hearing for three specific individuals involving common issues among those three individuals relative to transfer petitions.See In Re: Kevin Clark, M.P. 99-1601, consolidated withIn Re: Rahsaan Muhammed, M.P. 99-1602 and In re: *Page 10 Pheakiny Nem, M.P. 99-4546 (R.I. Super. Ct.) (June 21, 2000). The purpose of that order of consolidation was to allow the hearing Justice to address legal issues common to all three petitions, namely whether those defendants were entitled to evidentiary hearings with respect to the transfer petitions filed by MHRH to send them back to the ACI, and, if so, which party bears the burden of proof at such a hearing, and what is the quantum of evidence required to sustain that burden.
Upon completion of the above-described consolidated hearing, the hearing Justice issued a written decision on June 21, 2000, holding that GL 1956 § 40.1-5.3-9 provides an inmate with a right to a hearing on any petition filed by the Director of MHRH to transfer a defendant from the Forensic Unit back to the ACI. The June 21, 2000, decision also provided that in connection with such a petition filed by MHRH, the Director must prove, by a preponderance of evidence, that the inmate has sufficiently recovered his or her mental health, (in that there is no longer clear and convincing evidence that the inmate is mentally ill and needs specialized mental health services and psychiatric inpatient services that cannot be provided in a correctional facility), and that the Court should exercise its discretion to order the return transfer. See In re:Pheakiny Nem, 2002 WL 475278, Decision of the Superior Court, M.P. 99-4546 dated March 11, 2002 at p. 13, and §§ 40.1-5.3-7,40.1-5.3-9.
 Present Issues
Considering the emergency described by MHRH and the Court's pre-hearing transfer based upon that allegation, the present issues for resolution include: 1) a determination as to whether Respondent has sufficiently recovered his mental health, (in that there is no longer clear and convincing evidence that Respondent is mentally ill and *Page 11 
needs specialized mental health services and psychiatric inpatient services that cannot be provided at the ACI), and that this Court should exercise its discretion and ratify its previous order for the return transfer prior to this hearing; 2) an analysis of the due process considerations applicable in light of what has specifically occurred in the instant case. This second factor, while not essential to the ultimate resolution of the petition to return Respondent to the ACI, will be analyzed nonetheless given the vigorous objections of the Mental Health Advocate described above, and to the extent that such an analysis might help avoid the polarity as it presently exists between the parties in the future. The issues will be discussed in separate sections herein. The specific testimony of a particular witness, or applicability of any exhibit in evidence, will be discussed in the relevant section of this Decision.
 Section I Respondent is no longer in need of specialized mentalhealth services and psychiatric inpatient services thatcannot be provided at the ACI
Dr. Pedro F. Tactacan:
Dr. Tactacan is the attending psychiatrist at the Forensic Unit. He is board certified in adult psychiatry. He testified that he was familiar with Respondent's treatment during the time Respondent was at the Forensic Unit. He testified that Respondent does not presently suffer from an Axis I disorder that requires inpatient psychiatric hospitalization and treatment at the Forensic Unit. He explained that Axis I disorders are major mental illnesses that are treated at the Forensic Unit. Dr. Tactacan testified that he was familiar with the circumstances that caused Respondent's transfer into the Forensic Unit. He indicated he was familiar with incidents where Respondent engaged in self-injurious behavior. He testified that he evaluated Respondent for major *Page 12 
depressive disorder, post traumatic stress disorder, and general anxiety disorder. Dr. Tactacan gave the opinion that Respondent did not suffer from a major depressive disorder, and he did not suffer from active symptoms of post traumatic stress disorder. Dr. Tactacan testified that he was familiar with an incident where Respondent was located in a bathroom in the Forensic Unit with a sock around his neck. He acknowledged that Respondent was sent out to the R.I. Hospital at around 10:00 P.M. and returned to the Forensic Unit the following morning. He did not rethink his diagnosis following the incident and indicated that it confirmed what he already knew about Respondent. He felt that Respondent was being manipulative. He felt that Respondent was attempting to remain at the Forensic Unit despite the diagnosis that there was nothing that could be done for Respondent in terms of treatment that could not be performed while Respondent was back at the ACI.
Dr. Tactacan was specifically questioned about paragraph 3 of Dr. Jody Underwood's affidavit dated September 23, 2009. That document is attached to the original petition of the Director of the Department of Corrections to transfer Respondent into the forensic Unit. Dr. Underwood, in Paragraph 3, specifically provides:
 It is my professional opinion that Mr. Irving Briggs is suffering from a psychiatric illness, which currently includes symptoms of Major Depressive Disorder with Psychotic Features as well as Post Traumatic Stress Disorder and Generalized Anxiety Disorder. In addition, he carries the diagnoses of Antisocial and Borderline Personality Disorder with a history of non-suicidal self-injurious behaviors that have required several emergency visits and/or surgeries and hospitalizations at RI Hospital.
Dr. Tactacan would not testify that Dr. Underwood was wrong. He did indicate that at the present time, he disagreed with the content of Paragraph 3. Respondent's treatment records, specifically Respondent's Exhibit 4 are before the Court. Dr. Tactacan *Page 13 
could not explain the document's failure to completely address a discharge plan for Respondent. The law provides for an individualized treatment plan for the Respondent, as well as others in general. This would include an adequate discharge plan. The statute specifically provides:
 § 40.1-5.3-14 Right to treatment — Treatment plan. — Any person who has been committed or transferred to a facility for care and treatment pursuant to this chapter shall have a right to receive the care and treatment that is necessary for and appropriate to the condition for which he or she was committed or transferred and from which he or she can reasonably be expected to benefit. Each person shall have an individualized treatment plan. This plan shall be developed by appropriate mental health professionals, including a psychiatrist. Each plan must be developed within ten (10) days of a person's admission to a facility.
By the end of the hearing, through the use of several post hearing conferences, the deficiencies were worked out with input from the Mental Health Advocate. The Mental Health Advocate filed a Motion for Discharge Plan Elements set by the Court on January 20, 2010. The Court received a copy of a 2-page document entitled "Addendum to Discharge Summary" addressed to the Court and dated January 20, 2010. This document was never entered as a formal exhibit.
Dr. Jody Underwood:
Dr. Underwood is employed as a psychiatrist with the R.I. Department of Corrections. She testified that she was familiar with Respondent as well as the circumstances surrounding Respondent's transfer from the ACI to the Forensic Unit. She testified that Respondent had multiple episodes involving the insertion of objects into different orifices of his body and also engaged in an attempt to hang himself while at the ACI. She reiterated the components of an affidavit she gave regarding Respondent's transfer to the Forensic Unit back on September 24, 2009. She testified that was not her *Page 14 
diagnosis on the day she testified (January 13, 2010). She testified that Respondent's symptoms were in remission due to his medication regimen at this time.
The Court finds the testimony of each of the above witnesses credible and forthright.
Findings:
At the present time, as well as of November 2, 2009, a preponderance of evidence indicates that Respondent has sufficiently recovered his mental health and is no longer in need of specialized psychiatric services that can only be provided at the Forensic Unit. This particular point was conceded by the Mental Health Advocate at final argument.
 Section II Due Process Considerations
Given the circumstances of the transfer, some consideration of the due process concerns is in order at this time. MHRH appeared before the Court on November 2, 2009, with an emergency petition to transfer Respondent back to the ACI. The allegations constituting the basis of the emergency were initially presented in a letter dated November 2, 2009, addressed to H. Reed Cosper.[20] The letter stated that Respondent's continued presence at the Forensic Unit presented a "clear health and safety risk to other patients and staff on the ward." In Court, MHRH represented that Respondent presented a "significant danger to the patients in the Forensic Unit and also to the staff." Concerns included allegations that Respondent had attempted to strangle another patient, threatened the nursing staff, and threatened his treating psychiatrist. MHRH indicated that concerns were such that the ACI's security team came to the Forensic Unit to undertake a complete search of the Forensic Unit. MHRH also indicated *Page 15 
a concern that Respondent had indicated an intent to elope. MHRH characterized the circumstances as "extreme circumstances" and indicated at that point, MHRH could not keep the "patients in the unit or the staff safe," and further indicated that there was some indication from MHRH staff that they wish to no longer be on the unit because of their safety.[21] MHRH also indicated a concern that Respondent had committed two murders in the State of Illinois. While the subject was discussed in a conference, the record does not clearly reflect that particular argument. Ultimately, this information was acknowledged as untrue on November 5, 2009, and the Court found the representation "troubling."[22] When asked for a time frame, MHRH indicated the time frame was within the last two weeks. MHRH indicated that the CEO of the hospital was in the courtroom and they also had a video purporting to show the attempted strangulation incident described above. The Mental Health Advocate objected to the transfer.[23]
After hearing the concerns, the Court took a brief recess, reviewed prior precedents, and thereafter ordered the transfer of the Respondent back to the ACI, and set the matter down for hearing on November 5, 2009.
On November 5, 2009, MHRH appeared ready to proceed with the hearing but the Mental Health Advocate preferred to argue a motion for the Court to reconsider, and vacate its previous order, and order Respondent's transfer back to the Forensic Unit pending a hearing on the merits regarding Respondent's ultimate transfer back to the ACI.[24] *Page 16 
Arguing in opposition to the Mental Health Advocate's position, MHRH indicated that it was prepared to bring in witnesses who would speak of "incredible violence" that Respondent caused while on the Forensic Unit.[25] MHRH also filed a new petition for transfer of Respondent back to the ACI. The petition recited that after evaluation, there were no specialized services appropriate for Respondent at the Forensic Unit (Paragraph 3). The petition also indicated that it was being brought on an emergency basis due to Respondent's assaultive behavior, including an attempt to kill a patient by strangulation while at the Forensic Unit as well as Respondent's threatening to kill staff, including his treating psychiatrist and a nurse. (Paragraph 4). The petition also recited that Respondent did not require specialized psychiatric care or psychiatric hospitalization, (Paragraph 5) and the Department of Corrections did not object to Respondent's transfer back to the ACI. (Paragraph 6). Attachments in support of the petition included a 3-page letter from Dr. Tactacan to Craig Stenning, a 2-page affidavit from Dr. Tactacan, dated November 3, 2009, and a 1-page letter from Erin Benfante, an RN in the Forensic Unit.
Dr. Tactacan's affidavit indicated that he was Respondent's attending psychiatrist since Respondent's admission to the Forensic Unit on September 24, 2009. (Paragraph 3). The affidavit further indicated that Dr. Tactacan had engaged in numerous one-on-one conversations with Respondent, reviewed Respondent's medical records, and, in Dr. Tactacan's opinion, Respondent was not in need of specialized psychiatric services at the Forensic Unit. (Paragraphs 4, 5, 6). The affidavit also indicated that Respondent engaged in "assaultive dangerous behavior that adversely impacted the health and safety of both patients and staff" while Respondent was a patient in the Forensic Unit, and alleged that *Page 17 
Respondent, on more than one occasion, physically assaulted smaller and more vulnerable forensic patients. The affidavit also alleged that Respondent attempted to strangle one patient and it took three mental health workers to remove Respondent from that patient. (Paragraph 7). The affidavit also alleged that Respondent told Dr. Tactacan that Respondent and another patient were engaged in discussions to escape, and also that Respondent had "bragged" to Dr. Tactacan that there would be "a disturbance at the Forensic Unit," and also that Respondent had first hand knowledge of weapons in the unit. (Paragraph 8). Dr. Tactacan's affidavit contained other allegations about conversations with Respondent where Respondent bragged he could fashion and create weapons out of mundane and easily accessible items on the Forensic Unit as well as a time when the ACI's search team discovered hidden contraband including a pipe and a "shiv" knife made from a plastic spoon.[26] (Paragraphs 9, 10.) Dr. Tactacan indicates in his affidavit that he has a concern for the safety of staff and patients and also a concern for his own safety while on the Forensic Unit. (Paragraph 11). The affidavit went on for a total of sixteen paragraphs.
Ms. Benfante's letter dated November 3, 2009, contains a narrative describing several incidents including:
 • September 29, 2009, Respondent seen choking another patient; Patient #X019475
 • October 2, 2009, Respondent seen punching same patient repeatedly in the face;
 • October 4, 2009, Respondent was bragging he could make weapons (referring to a baseboard);
 • October 2, 2009, documented in Respondent's chart that he (Respondent) wanted to return to prison so he doesn't kill another patient. #X019475
 • October 9, 2009, Nurse Benfante saw the video of Respondent assaulting patient #X019475 repeatedly; *Page 18 
 • October 10, 2009 — a report Respondent was overheard arguing with a patient and said next time he would put him in the hospital;
 • October 27, 2009, Respondent was out in the courtyard and needed to be restrained from going after another patient;
 • October 27, 2009, CO's came to search and found a shank hidden in the grate in Respondent's room, a pipe was also found;
 • October 30, 2009, behavior specialist spoke to Respondent about taking food off another patient's tray; Respondent swore at staff and threatened to punch next time;
 • October 31, 2009, Respondent threatened Nurse Benfante when she asked him to take the sheets off his head, later came and pounded on nursing office door.
 The Rule of Law
It has been seriously suggested by the Mental Health Advocate that the rule of law has been diluted by the events in this case.[27]
Given the gravity of the allegation and the circumstances of Respondent's transfer back to the ACI, the Court will provide further scrutiny and discussion to the extent it may provide a catharsis for all involved. The rule of law is a general legal maxim according to which decisions should be made by applying known principles or laws, without the intervention of discretion in their application. This maxim is intended to be a safeguard against arbitrary governance. The Rhode Island Supreme Court has recently commented on the importance of the rule of law in the case ofState of RI v. Lead Industries Association, Inc., 951 A2d 428
(2008). In Track I of the opinion, the Court stated:
 Law consists for the most part of enactments that the General Assembly provides to us, whereas justice extends farther. Justice is based on the relationship among people, but it must be based upon the rule of law. This Court is powerless to fashion independently a cause of action that would achieve the justice that these children deserve. United States Supreme Court Justice Benjamin N. Cardozo, a rightly revered student of the law, once summarized as follows the inherent limitations of the judicial role: *Page 19 
 The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to `the primordial necessity of order in the social life.'" Benjamin N. Cardozo, The Nature of the Judicial Process 141 (1921) (quoting François Gény, Méthode d'Interprétation et Sources en droit privé positif, vol. II, p. 303, sec. 200, ed. 1919; transl. Modern Legal Philosophy Series).
 Likewise, in the words of United States Supreme Court Chief Justice John G. Roberts, Jr., "judges must be constantly aware that their role, while important, is limited. They do not have a commission to solve society's problems, as they see them, but simply to decide cases before them according to the rule of law." John G. Roberts, Jr., United States Senate Committee on the Judiciary Questionnaire 66, http://www.nytimes.com/packages/pdf/politics/20050802
Roberts 2. (pdf) (August 2, 2005). In recognition of this philosophy, we consistently have adhered to "principles of judicial restraint [that] prevent [courts] from creating a cause of action for damages in all but the most extreme circumstances." Bandoni v. State, 715 A.2d 580, 595 (R.I. 1998). Indeed, we long have held "that the creation of new causes of action is a legislative function." Accent Store Design, Inc. v. Marathon House, Inc., 674 A.2d 1223, 1226 (R.I. 1996). After all, the judiciary's "duty [is] to determine the law, not to make the law." City of Pawtucket v. Sundlun, 662 A.2d 40, 57 (R.I. 1995). "To do otherwise, even if based on sound policy and the best of intentions, would be to substitute our will for that of a body democratically elected by the citizens of this state and to overplay our proper role in the theater of Rhode Island government." DeSantis v. Prelle, 891 A.2d 873, 881 (R.I. 2006).[28] Id. at 436. (Footnote in above text omitted).
While the instant case does not involve consideration of a new cause of action, it does involve an allegation that this Court was seriously misled as to the circumstances surrounding the need to transfer Respondent immediately back to the ACI prior to a hearing. A review of the evidence on that issue is in order at this time. *Page 20 
 Dr. Pedro F. Tactacan:
By the time Dr. Tactacan testified, it was already clear that Respondent had not committed any homicides within the State of Illinois. Dr. Tactacan admitted in his testimony that he had obtained the information from Respondent himself, but had been unable to confirm same through a review of ACI records. He had unsuccessfully attempted to use an online resource to confirm the information and ultimately had obtained a release from Respondent and had sent it to the State of Illinois in an attempt to acquire the records. This Court assumes that Dr. Tactacan is probably not an authorized individual who can access the criminal records through the interstate system.[29] Notwithstanding his inability to obtain the information through proper channels, he still maintained that Respondent would make various threats. He described Respondent as manipulative. While he had a great deal of one-on-one interaction with Respondent as attending psychiatrist in the Forensic Unit, he received other information from individuals who appeared to be in fear of Respondent. At one point Dr. Tactacan noted that Respondent's presence in the Forensic Unit was counter therapeutic to the unit because his presence was "causing fear and terror in the unit and we cannot have a patient like that." (1/12/10 morning session). Notwithstanding Dr. Tactacan's lengthy testimony, (He testified on 12/2/09 afternoon session; 12/10/09 afternoon session; 1/11/10 afternoon session; and 1/12/10 morning and afternoon) as well as the allegations in his affidavit described above; he did not dwell much on his feeling of being personally threatened by Respondent. His testimony was focused more *Page 21 
on the technical components of Respondent's psychiatric analysis.
Joseph Monteiro, Mental Health Worker (MHW):
Mr. Monteiro, in his MHW role, is responsible for one-on-one supervision of individuals who may need higher security while at the Forensic Unit. The higher security may involve handcuffing and use of other restraints when an individual patient becomes more aggressive. The one-on-one assignments are called "specials." He testified that he had been given some background information about Respondent from a ward report indicating the unit had a potentially volatile individual who was a danger to the staff. Mr. Monteiro testified that the person (Respondent) was described as acutely psychotic, serving a lengthy sentence, and had injured a correctional officer.
Mr. Monteiro testified that he was assigned to "special" Respondent because of altercations between Respondent and other patients. He testified that he was assigned to "special" Respondent more than once and the times that he was present, Respondent required no further restraint. He testified that there was an incident where another patient, who had a problem with inappropriate touching, engaged in some inappropriate touching of Respondent resulting in a violent outburst, and the other patient was restrained. The witness testified that he came to know Respondent and the person he came to know was not consistent with the person he had been told about. He testified about the incident where Respondent went into the bathroom at the Forensic Unit and put the sock around his neck.
Ralph Gibbs, MHW:
Mr. Gibbs testified that he did not receive any special information about Respondent prior to being assigned to "special" him. He testified that he was working *Page 22 
on the Sunday shift when an incident occurred between Respondent and the nurse on the Forensic Unit. He had gone to lunch and when he came back from lunch, he sat in the room with Respondent who was lying down with a sheet over his head. The witness acknowledged a policy of not allowing patients to sleep with blankets over their heads. After unsuccessfully asking Respondent to take the sheet off his head, the witness described the nurse coming into the room and a verbal altercation ensuing between Respondent and the nurse over Respondent's refusal to remove the sheet. As the situation escalated, the nurse left the room and went back to the nurses' station. The witness testified that Respondent followed her back to the nurses' station and punched the glass in the door and said "I want to talk to you." The witness entered the nurse's station to speak to the nurse, who he observed was crying at that time. He testified that he left the nurse with second shift workers while he went back out to speak to Respondent. He testified that the nurse had called the doctor and the doctor wanted restraints used but he did not place Respondent into restraints. The witness further testified that he stayed with Respondent for a while and the nurse was escorted off the ward by the second shift.
Erin Benfante, RN:
Nurse Benfante is the individual who had the altercation with Respondent. She testified that she was working a day shift on 11/1/09.[30] She further testified she entered Respondent's room on that day, found Respondent sleeping, and stepped over him to get at a clipboard. She testified that she spoke Respondent's name, Respondent woke *Page 23 
up, and thereafter Respondent became very upset and screamed at her. She testified that she told respondent that he could not have a sheet over his face, and she said that to Respondent more than once. The witness testified that Respondent was yelling at her and she noticed another patient sitting in the day room. At that point, she testified that she left because she was fairly embarrassed and she did not want problems with Respondent. She went on that she went to the nurses' station and called the SRN office (her supervisor) to let them know that Respondent was agitated and she requested extra staff. She testified that Respondent was saying he would turn the ward upside down and there was nothing they [MHWs] could do to prevent him from getting to her. The witness testified that she was afraid and she took it very seriously. It was apparent to the Court at this point that the witness was in distress and her claim of fear appeared sincere. She testified that she heard him [Respondent] pounding and she thought Respondent kicked her door. The witness grew more distraught as she testified about Respondent's agitated state. She testified that she called Dr. Tactacan, who told her to have respondent put in restraints, but Respondent was not placed in restraints. She testified that Mr. Gibbs would go in and out of the nurses' station but would not say anything. The night shift MHW helped escort her out the side door. She testified that other patients witnessed the events.
Cross examination of the witness began after the break. After initially eliciting background information on credentials, experience, and employment history, the Mental Health Advocate encountered a great deal of difficulty attempting to get the witness to acknowledge that the facility was a secure facility. The witness resisted this acknowledgment for several minutes. The witness did acknowledge that before *Page 24 
Respondent arrived, she heard that he tried to commit suicide, and had a history of depression. She also acknowledged that other dangerous patients were admitted from time to time on the unit. The witness also indicated that she filled out an incident report which was filed on the incident she testified about with Respondent. (It had earlier been stipulated that no incident report existed). After the lunch recess, the witness experienced another 20 minutes of a difficult cross but still maintained that she was terrified of Respondent. She indicated that she needed to leave the Court to attend to a young child who would be getting off the bus at home. She was excused until the next court date. While unavailable on the next court date, the witness did appear on the final day of hearing. By that time, the Mental Health Advocate was in possession of several reports[31] of the Forensic Unit dealing with Respondent. They were marked accordingly as Exhibits 7 through 14. A video disc was also introduced as Exhibit 15. The witness testified that throughout the reports, various patients were referred to by a specific number. Respondent was identified as patient #X019548 in the reports. Another patient that Respondent had altercations with was identified as patient #X019547. This patient was also referred to as Mr. "O". The witness acknowledged certain facts about each incident report. The relevant information from each exhibit is set forth in succinct form below. Each incident report is highlighted. There is a typed transcript and an affidavit attached to each exhibit. The Court received Exhibit 15 which purported to be a video CD with approximately 5 minutes of video related to Respondent. The incident was not the main incident. The Court was unable to view the CD. The Exhibits are:
 Exhibit 7 — Confidential Report of Incidents — 9/29/09 — Respondent identified as patient #X019548 — No apparent injury — other patient identified as X019475 *Page 25 
Description — Respondent exiting his room when other patient threw a fake punch which caught Respondent off guard. Respondent put his hands around other patient's neck and restrained other patient to the ground. No apparent injury. Josephine St. John RN
 Second incident — two patients involved in a scuffle provoked by one patient horse playing with another — a staff member was seriously injured by the patient who started the scuffle. Allen LeBeau 5/30/09
 The identity of the patients involved in the second incident is not disclosed. The date of 5/30/09 also predates Respondent's entry on the Forensic Unit.
 Exhibit 8 — Confidential Report of Incidents — 10/5/09 — Staff reported that respondent and patient X019475 were in BR together; earlier seen by Dr. Tactacan and told they were not to be together due to a previous incident between the two that occurred about a week earlier. Mental Health Worker told the nurse he asked Respondent what happened and Respondent stated that he just banged (other patient) out. The nurse spoke to the other patient (X019475) who stated that he was in the room and Respondent just walked in. Patient claimed he was not hit by Respondent. Respondent told the nurse the other patient swung at him and he just pushed him away. No injuries reported. Thelma McGual RN
 Dr. Tactacan was aware of the increase in agitation and placed other patient on 1:1 individual supervision.
 Exhibit 9 — Confidential Report of Incidents — 10/27/09 — Respondent found lying on bathroom floor in fetal position . . .with sock tied around his neck. Lethargic pulse noted, vital statistics noted. Transported to RI Hospital via rescue at 2200 hours; returned to unit 02:45 hours stable. St. John RN
 Exhibit 10 — Confidential Report of Incidents — 10/27/09 — Respondent stated to staff that he found a pen cover (cap) in hallway. Dr. Tactacan was advised. Room search revealed no pen found. Josephine St. John RN
 Exhibit 11 — Confidential Report of Incidents — 10/27/09 — Respondent went into nurses station between 8:30 and 9:00 AM. Joseph Monteiro (MHW) was specialing (patient supposed to be at arms length and he was not) — When asked what Respondent needed, MHW Monteiro asked if Respondent was allowed to call his patient advocate. Hospital policy is to always allow this kind of call. Respondent left but returned with MHW. MHW picked up phone in nurses' station to call *Page 26 
patient advocate. MHW was redirected to use phone further down hallway that all other patients use.
 There is a note that Respondent has been seen using that hallway phone many times before and the note continues that MHW Monteiro was aware of this policy and used it as a form of intimidation.
 E. Benfante RN. Note the signature is dated 11/3/09; a date after Respondent was transferred out of the unit. The report is dated 10/27/09.
 Exhibit 12 — Confidential Report of Incidents — 10/31/09 — 2:35PM — Writer went to respondent's room to sign 1:1 observation form, it was noted that MHW Gibbs, who was specialing patient was sleeping. This is a violation of policy. E. Benfante RN
 Exhibit 13 — Confidential Report of Incidents — 10/31/09 — 3:00PM — Note that writer had an incident with Respondent and called Dr. Tactacan, who ordered Respondent to be put in restraints — when writer asked another MHW (name omitted) the MHW responded that she better back off, it would make things worse — (the note continues but does not make complete sense — it is possible the MHW is offering to get the writer out of the unit safely).
 Exhibit 14 — Confidential Report of Incidents — 10/20/09 — does not relate to Respondent at all.
Dr. Charlene Tate:
Dr. Tate is the Medical Director and Chief of Clinical Services at the Forensic Unit. She testified that she was aware of problems with Respondent while he was a patient in the Forensic Unit and there was an escalating concern. She testified that the most significant incident was the one that occurred on the weekend with Nurse Benfante. Based upon all the information she had from Nurse Benfante and others, it was her opinion that they needed to get Respondent out of the Forensic Unit as he did not need the specialized services there. She acknowledged that transfer plans were underway before the weekend of October 31 and November 1, 2009. The planning could have been at least a month before that weekend and perhaps even more. Dr. Tate testified that she had "grave concerns" which mainly consisted of a culmination of incidents one month *Page 27 
prior to that weekend. She testified that she was concerned for the safety of patients and staff and she admitted that she recommended transfer of Respondent. The Court finds this testimony sincere and credible. It appeared that the witness had a genuine concern for the safety of the patients and staff on the Forensic Unit.
 Lack of Statutory Provision addressing this kind ofEmergency
The mental health laws contain two provisions dealing with emergencies. G.L. 1956 § 40.1-5-7 makes provisions for emergency certification for admission into a suitable psychiatric inpatient facility as defined in that chapter in emergency situations. G.L. 1956 § 40.1-5.3-13, describing the general rights of patients committed for care and treatment under that chapter, provides that all patients are entitled to be free from restraint or seclusion except during an emergency. An emergency under that section is defined as an imminent threat of serious bodily harm to the patient or to others. There is no provision for situations in which an individual's continued presence in the Forensic Unit presents a danger to other patients and/or staff in the unit. The Mental Health Advocate at one point argued that Respondent has a statutory right to be restrained and secluded in the event of an emergency.[32]
There is no statutory provision covering a situation where authorities in charge of the Forensic Unit feel that their own measures are not adequate.
In the case of State v. DiStefano, 764 A.2d 1156 (R.I. 2000), Justice Bourcier wrote in his dissenting opinion:
 As Justice Sutherland, in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 404, 57 S.Ct. 578, 587, 81 L.Ed. 703, 715 (1937), aptly noted, "[t]he judicial function is that of interpretation; it does not include the power of amendment under the guise *Page 28 
of interpretation." Justice Flanders, writing along similar lines some time ago in his dissent in Kaya v. Partington, 681 A.2d 256 (R.I. 1996), observed what I believe bears repetition in this case. He said:
 [T]he reality is, when, as here, a statute is silent on the subject at issue, we judges have absolutely no clue about what result the Legislature would have intended had it ever considered the question presented, especially when we depart from the text of a statute and attempt to find some hidden legislative design or intent that answers a problem not resolved by what the Legislature actually said." Id. at 264.
He further explained:
 `For purposes of judicial enforcement, the `policy' of a statute should be drawn out of its terms, as nourished by their proper environment, and not, like nitrogen, out of the air.' . . . Our goal is to construe the statute as it is written and not to divine sound public policy out of legislative silence, references to imagined legislative intentions, or our own predilections. As Justice Frankfurter once warned, `The search for significance in the silence of [the Legislature] is too often the pursuit of a mirage. We must be wary against interpolating our notions of policy in the interstices of legislative provisions.'
 The reason to be on guard is that when legislative silence is confronted, the temptation is omnipresent for . . . the court to intrude its own preferred policies into the law under the euphemistic banner of `filling in a legislative gap' or `interstitial' lawmaking." Kaya, 681 A.2d at 267-68. Id. 764 A.2d at 1185-86, Bourcier, J., dissenting opinion.
 Administrative Regulations may fill in the gap
The Mental Health Advocate vigorously maintained that the present history and structure of the mental health laws governing transfers and admissions back and forth between the Forensic Unit and the ACI may contain a magnificent abstract set of rights but the actual process is bollixed.[33] To the extent the process lacks precision or expertise, administrative regulations are a potential solution that may provide for flexibility that the traditional legislative process. *Page 29 
There is a presumption of expertise accorded to an administrative agency or a department. Judicial deference to an administrative agency decision is proper and necessary when the agency's decision is based on highly specialized knowledge of a particular matter within the agency's expertise. Robert E. Derecktor of RhodeIsland, Inc. v. U.S., 762 F.Supp. 1019, 1022 (D.R.I. 1991). An agency's interpretation is given controlling weight unless clearly erroneous or inconsistent with the law. Citizens Savings Bank v.Bell, 605 F.Supp. 1033, 1041 (D.R.I. 1985). It is well-established that a higher level of deference is owed when a court reviews agency determinations of matters within the agency's specialized expertise. See R.I. Higher Education AssistanceAuthority v. Secretary, U.S. Dept. of Education, 929 F.2d 844,857 (1st Cir. 1991) (citing Lile v. University ofIowa Hospitals and Clinics, 886 F.2d 157, 160, (8th Cir. 1989); Building and Construction TradesDept., AFL-CIO v. Brock, 838 F.2d 1258, 1266 (D.C. Cir. 1988)) ("It is apodictic that a reviewing court shall accord an agency's decision considerable deference when that decision involves a technical question within the field of the agency's expertise.").
It is important to be aware at the outset of any administrative venture that the rule-making authority of an administrative agency shall not be extended so as to vary the statutory rights of individuals. Little v. Conflict of Interest Comm.,121 R.I. 232, 236, 397 A.2d 884, 886 (1979). It is a basic tenet of administrative law that the rule-making power of an administrative body may not abrogate state law dealing with the same subject.Reback v. Rhode Island Board of Regents for Elementary andSecondary Education, 560 A.2d 357, 358 (R.I. 1989).
As creations of the Legislature, administrative agencies must have specific *Page 30 
statutory authority for the regulations they promulgateBerkshire Cablevision of Rhode Island, Inc. v. Burke,488 A.2d 676, 679 (R.I. 1985). It is true that a legislative rule is as binding on a court as would be a statute, but only if it is the product of an exercise of delegated legislative power. Lerner v.Gill, 463 A.2d 1352, 1358 (R.I. 1983).
Both MHRH and the Department of Corrections have specifically delegate legislative power for regulations they may choose to promulgate. The following statutes, set forth in relevant parts, demonstrate that authority:
 40.1-1-13 Powers and duties of the office. — Notwithstanding any provision of the Rhode Island general laws to the contrary, the department of mental health, retardation, and hospitals shall have the following powers and duties: . . .
 (12) To promulgate rules and regulations necessary to carry out the requirements of this chapter;
 40.1-5-3 General powers and duties of state department of mental health, retardation, and hospitals. — (a) The state department of mental health, retardation, and hospitals is charged with the execution of the laws relating to the admission and custody of the mentally disabled. . . .
 (g) The director may adopt such rules and regulations governing the management of facilities, both public and private, as he or she may deem necessary to carry out the provisions of this chapter to insure the comfort and promote the welfare of the patients.
 40.1-5.4-11 Rules and regulations. — The director of mental health, retardation, and hospitals, after consultation with agencies and individuals knowledgeable about and concerned with persons with serious mental illness shall make and promulgate such rules and regulations pertaining to services for persons with serious mental illness as specified in this chapter when the services are provided in whole or in part by the use of state and/or federal funds earmarked for persons with serious mental illness.
 Department of Corrections
 § 42-56-10 Powers of the director. — In addition to exercising the powers and performing the duties, which are otherwise given to him or her by law, the director of the department of corrections shall: . . .
 (22) Make and promulgate necessary rules and regulations incident to the exercise of his or her powers and the performance of his or her duties, *Page 31 including, but not limited to, rules and regulations regarding nutrition, sanitation, safety, discipline, recreation, religious services, communication, and visiting privileges, classification, education, training, employment, care, and custody for all persons committed to correctional facilities. (Emphasis added in all of above).
Chapter 42-35 of the General Laws governs the promulgation of rules by an agency. Specifically, sections 1 through 6 as set forth below provide the details as to the procedures, reporting, and record-keeping requirements.
 • § 42-35-1 Definitions.
 • § 42-35-1.1 Bodies subject to chapter.
 • § 42-35-2 Public information — Adoption of rules — Availability of rules and orders.
 • § 42-35-2.1 Rules coordinator.
 • § 42-35-2.2 Rule-making file.
 • § 42-35-2.3 Concise explanatory statement.
 • § 42-35-2.4 Electronic filing.
 • § 42-35-3 Procedures for adoption of rules.
 • § 42-35-3.1 Form for filing — Failure to properly file.
 • § 42-35-3.2 Incorporation by reference.
 • § 42-35-3.3 Regulations affecting small business.
 • § 42-35-3.4 Periodic review of rules.
 • § 42-35-4 Filing and taking effect of rules.
 • § 42-35-4.1 Refiling of rules and regulations.
 • § 42-35-4.2 Periodic refiling of rules and regulations.
 • § 42-35-5 Compilation and publication of rules.
 • § 42-35-5.1 Regulatory agenda.
 • § 42-35-6 Petition for adoption of rules. *Page 32 
 Analysis and Significance of Evidence, Credibility Assessments, Weight of Evidence.
Given that there is no precise statutory provision or other regulation covering the emergency as described by MHRH, the Court will proceed to assess witness credibility, assign weight to evidence, and discuss other matters of significance relative to this particular section of the Decision.
Dr. Tactacan was very detailed and confident in his testimony regarding his psychiatric analysis of Respondent. His actual testimony as to his own fears falls short of what appears in his affidavit. This may have been due to counsel's selection of what questions to ask Dr. Tactacan and what information to elicit from him during his several days of testimony. He was taken in with Respondent's falsified story about killing two members of a gang and he unsuccessfully attempted to find the information by performing a Google © search on the internet. The falsity of the murder allegations had been determined as early as November 5, 2009. Dr. Tactacan's affidavit also indicated that Respondent engaged in "assaultive dangerous behavior that adversely impacted the health and safety of both patients and staff" while respondent was a patient in the Forensic Unit, and alleged that Respondent, on more than one occasion, physically assaulted smaller and more vulnerable forensic patients. The affidavit also alleged that Respondent attempted to strangle one patient and it took three mental health workers to remove Respondent from that patient. The affidavit stands in some contrast to Exhibits 7 through 13 which were not available at the beginning of the hearing in November or December and did not appear in Court until the final day of hearing. Without reading too *Page 33 
much into the delay, a reading of the reports in each exhibit makes the actual activity appear more benign than what appears in Dr. Tactacan's affidavit.
Joseph Monteiro and Ralph Gibbs were two mental health workers (MHW) who testified at the hearing. They were assigned to "special" the Respondent during certain specific times in the Forensic Unit. This process involves a close one-on-one supervision of Respondent during which time they are supposed to be no more than one arm's length away. Both witnesses appear larger and more muscular than Respondent. They also appear seasoned enough so as not to be in fear of Respondent, and both testified that they got along well with Respondent during the times they were with him. Mr. Monteiro had heard some background information about Respondent, and Mr. Gibbs was aware of certain information by virtue of his presence in the courtroom throughout Mr. Monteiro's testimony. Both witnesses testified that their experiences with Respondent were not consistent with the information they previously heard about Respondent that others had already indicated to the Court. Mr. Gibbs testified about the incident where Respondent was angered by Nurse Benfante over her repeated request to Respondent to remove a sheet from Respondent's head. He testified that Respondent had gotten angry, gone to the nurses' station and pounded on the glass door demanding to speak with Nurse Benfante. He testified that Nurse Benfante was upset and afraid by the incident and she was later escorted out of the unit by other MHWs while he stood by Respondent during the time it took for Respondent to calm down. While Mr. Gibbs testified that he was not disturbed by the incident, there was a subtle suggestion that Nurse Benfante was acting irrationally. Mr. Monteiro testified about an incident of inappropriate touching of Respondent by another patient resulting in a violent outburst and thereafter the other *Page 34 
patient was restrained. Mr. Monteiro also testified about the specifics of Respondent's incident where Respondent tied a sock around his neck in the bathroom.
Nurse Benfante testified at length. She clearly appeared to be distraught and in fear. She indicated at one point she was in fear that Respondent would kill her. Specifically, when asked why she acted a certain way, she testified in a low voice that she "wanted to live." Her fear appeared sincere to the Court. It was interesting to note that upon listening to cross examination relative to Exhibits 7 through 13, and especially on reviewing Exhibit 11, there is an explicit suggestion in exhibit 11 that Mr. Monteiro allowed Respondent to enter the nurses' station unattended (even though he was assigned to "special" Respondent and stay within an arm's length) and Mr. Monteiro asked if Respondent could use the phone there to call his advocate. The note continued that Respondent and Mr. Monteiro left the nurses' station but came back a short time later together and Mr. Monteiro picked up the phone. The note went further, indicating that the policy was for patients to use a particular phone down the hallway and Mr. Monteiro knew that but used it as a "form of intimidation." (Emphasis added). This line was added on November 3, 2009, by Nurse Benfante during cross examination even though the incident actually occurred on October 27, 2009. The Court finds the reference intriguing but unclear. The Court is unsure if the note is a suggestion that Mr. Monteiro was allowing Mr. Briggs to approach as a form of intimidation to Nurse Benfante.
Exhibit 12 adds more intrigue with a report from October 31, 2009, where Nurse Benfante notes that Mr. Gibbs, who was assigned to "special" Respondent, was found *Page 35 
sleeping in Respondent's room. Sleeping is a violation of policy according to the testimony and the note.
Exhibit 13 is another report from October 31, 2009, listed at 3:00 PM which appears to be the incident Nurse Benfante had with Respondent banging on the door to the nurses' station. The note indicates that while Dr. Tactacan had ordered restraints, another MHW told her it would only make things worse. The report is somewhat confusing, but it appears that Respondent was not placed in restraints despite Dr. Tactacan's order, and Nurse Benfante was escorted off the unit. The words "the MHW responded that she better back off, it would make things worse" make this report intriguing as well, but the Court is unable to determine if the exchange was benign, or intended to be threatening to Nurse Benfante. Given all the Court has discussed regarding the testimony of Mr. Monteiro, Mr. Gibbs, and Nurse Benfante, the Court finds Nurse Benfante's fears sincere but cannot be sure just how rationally they are based.
Notwithstanding the Court's uncertainty, the Court was impressed with the credibility and sincerity of Dr. Tate. It is very clear to the Court that she was very concerned with the safety of the Forensic Unit. She did not personally observe many of the incidents described but she received written and verbal reports and attended meetings. She candidly admitted that planning to transfer Respondent back to the ACI was underway as much as one month before the incident with Nurse Benfante. Dr. Tate candidly admitted that the incident with Nurse Benfante was the last straw. She described the situation with Respondent as continually escalating. *Page 36 
Given all of the information the Court has set forth, and giving due consideration to the Mental Health Advocate's vigorous suggestion that since dangerous individuals are regularly kept on the Forensic Unit, that Respondent should be adequately restrained and secluded until a hearing could be accomplished, and given the subtle suggestion described above, that some form of intimidation may have been underway, and also that MHW staff would not automatically follow Dr. Tactacan's orders, the Court makes the following findings:
 1) The emergency described by MHRH on November 2, 2009, was not as acute as initially represented.
 2) The concern of Dr. Tate for the safety and security of the Forensic Unit and patients and staff in such Unit was credible and sincere. Giving due consideration to her candor, it is also understandable that she was affected by Nurse Benfante's considerable distress at the moment. She was also required to collect and assess the various inputs regarding Respondent's treatment and progress on the unit while not having any direct personal observation as to much of the input.
 3) Nurse Benfante's distress is sincere. However, the Court is unsure of how much of a rational basis exists for her distress. The Court cautions that the rational basis is a matter of degree in the context of this case.
 4) Dr.Tactacan's concern for the safety and security of the Forensic Unit and the staff and patients is also credible and sincere. The Court gives somewhat less weight to Dr. Tactacan's concern for his own personal safety given the precise content of his testimony compared to the allegations regarding his own personal safety set forth in his affidavit. The Court is extremely mindful that it was not Dr. Tactacan's choice as to what material to cover during his direct examination, and further — Dr. Tactacan's testimony regarding Respondent's psychiatric needs was very credible and given great weight.
It has been suggested to the Court that MHRH staff and administration have engaged in a conspiracy to remove Respondent from the Forensic Unit quickly, at any and all cost, and regardless of the legal requirements involved. The Mental Health Advocate strongly suggests that the Court has been deceived by MHRH. Making a reference to the Bible, and specifically Pontius Pilate, he has rhetorically asked, "What is *Page 37 
truth?"[34] In rhetorical response, the answer is that the truth is rarely pure and never simple.[35] Additionally, the Mental Health Advocate boldly asserts that all parties including himself, the Court, and counsel for MHRH "have become too comfortable" with the processes that exist at this time. Regarding this assertion, it is clear that to the extent that it first leads to a lack of empathy, and next to a lack of caring, and finally to an arrogance of power, then being too comfortable must be avoided. Singer, performer, and musician Jon Bon Jovi once said, "Don't get too comfortable with who you are at any given time — you may miss the opportunity to become who you want to be." The wisdom expressed in those thoughts is apparent upon even the most cursory reading of the sentence.
The reasonableness of any particular action must be judged based upon the perspectives existing among those involved at the time.See, e.g., Graham v. Connor, 490 U.S. 386,109 S.Ct. 1865 at 1872 (1989), ("the `reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"); Whitley v. Albers, 475 U.S. 312, 320-21,106 S.Ct. 1078, 1085 (1986), (neither judge nor jury should substitute their judgment for that of officials who have made a considered choice).
 Conclusion
As indicated above, the Court finds that MHRH has demonstrated by a preponderance of evidence that Respondent has sufficiently recovered his mental health *Page 38 
and no longer needs the specialized services of the Forensic Unit. Respondent's transfer back to the ACI is confirmed.
For reasons stated and discussed above, the Court declines to find a conspiracy among MHRH staff and administration to remove Respondent from the Forensic Unit at any and all costs.
[1] The instant Petition is actually a petition from Craig S. Stenning, Director of the Department of Mental Health, Retardation, and Hospitals to place Respondent back at the ACI.
[2] The Office of the Mental Health Advocate was created in 1975 when the legislature re-wrote and reformed the Mental Health Laws of Rhode Island. This reform was part of a national movement toward deinstitutionalization of mentally ill individuals, a movement which began in the 1950's and became a centerpiece of public policy in the 1970's after the United States Supreme Court declared that all states must provide Constitutional Due Process and legal counsel to individuals subjected to involuntary hospitalization. The original statue authorizing the Mental Health Advocate is codified at G.L. 1956, §§ 40.1-5-13, 40.1-5-22 and 24 (Public Laws 1974, Ch. 119). This statutory history is set forth in the Fiscal Year 2009 State Budget. It can be viewed online by visiting the R.I. Budget Office website at www.budget.ri.gov and selecting the FY 2009 Budget, and thereafter accessing the Technical Appendix, selecting Human Services, and thereafter selecting Office of the Mental Health Advocate.
[3] See original petition filed September 24, 2009.
[4] See Order in Court file.
[5] The Nov. 2, 2009 letter addressed to H. Reed Cosper, Esq. is in the Court file.
[6] OHHS is the Office of Health and Human Services. The precise name is the Executive Office of Health and Human Services. The Office was established by Executive Order of the Governor #05-21 dated December 1, 2005. See official website at www.eohhs.ri.gov for complete information.
[7] See (Tr. Nov. 2, 2009, at pp. 2 — 12.)
[8] (Tr. Nov. 2, 2009 at p. 16 line 24 through p. 18 line 19.)
[9] The section specifically provides: §40.1-5.3-6 Examination of persons awaiting trial or convicted and imprisoned forcrime. — On a petition of the director of the department of mental health, retardation, and hospitals, or on the petition of the director of the department of corrections, setting forth that any person awaiting trial or convicted of a crime and imprisoned for the crime in the adult correctional institutions is mentally ill and requires specialized mental health care and psychiatric in-patient services which cannot be provided in a correctional facility, a justice of the superior court may order the examination of the person as in his or her discretion he or she shall deem appropriate.
[10] This section specifically provides: § 40.1-5.3-9 Return toconfinement. — When any person transferred pursuant to § 40.1-5.3-7 has sufficiently recovered his or her mental health, he or she may, upon petition of the director and by order of a justice of the superior court in his or her discretion, be transferred to the place of his or her original confinement, to serve out the remainder of his or her term of sentence.
[11] Under the terms of Administrative Order 86-1, an acute emergency might justify an immediate transfer without a hearing.
[12] (Tr. Nov. 2, 2009, p. 17, lines 8 — 20.)
[13] (Tr. Nov. 2, 2009, p. 18, line 23 through p. 19 line 2.)
[14] Although the record is unclear regarding MHRH's readiness to proceed with its witness, the Court clearly recalls the matter being discussed in conference. The Mental Health Advocate was opposed to proceeding with the hearing that day indicating he wanted to formally object to the Court's Order.
[15] (Tr. Nov. 5, 2009, p. 3 at lines 8-10.)
[16] The Mental Health Advocate had indicated in conference that he needed some 15 minutes to bring certain factors to the Court's attention. He actually went beyond that time. (Tr. Nov. 5, 2009, p. 3 line 25 through p. 22 line 6.)
[17] See Counsel's argument in (Tr. Nov. 5, 2009, p. 19 L 17 through p. 20 L 2.)
[18] (Tr. Nov. 6, 2009, p. 7 Line 4 through p. 9 line 12.)
[19] The Court actually ordered the hearing to a conclusion that date given the fact that Respondent was not intending to call witnesses to refute the psychiatric testimony. Respondent was ordered to conclude his cross-examinations, centering on the circumstances of Respondent's emergency transfer, by 11:15 A.M., and immediately after the morning break, the parties commenced their respective summations, concluding at 12:15 P.M.
[20] See footnote 5 supra.
[21] See (Tr. of Nov. 2, 2009, p. 2 line 2 through p. 3 line 1.)
[22] See (Tr. of Nov. 5, 2009 p. 24 lines 13 — 15.)
[23] (Tr. of Nov. 2, 2009 p. 4 line 14 through p. 8 line 24.)
[24] See footnotes 14, 15, and 16 supra.
[25] (Tr. p. 22 lines 18 — 22.)
[26] The affidavit does not indicate where or when the items were located.
[27] (Tr. Nov. 5, 2009, p. 21 line 17 through p. 22 line 6.)
[28] The nytimes cite may now be unavailable to non subscribers as of (2/14/10). The material may be accessed at http://www.gpoaccess.gov/congress/senate/judiciary/sh109-158/browse.html; Senate Committee on the Judiciary: S. Hrg. 109-158, Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States; September 12-15, 2005.
[29] See generally 28 USC 534 limiting access to the National Crime Information Center (NCIC), which is the United States' central database for tracking crime-related information. Since 1967, the NCIC has been maintained by the Federal Bureau of Investigation's Criminal Justice Information Services Division, and is interlinked with similar systems that each state maintains. The out-of-state criminal records for an individual are generally obtained by accessing the Interstate Identification Index or (III).
[30] November 1, 2009 was a Sunday. Mr. Gibbs previously testified he was working on a Sunday. Nurse Benfant's letter dated November 3, 2009, indicates the incident occurred on October 31, 2009. A confidential Report of Incidents, Exhibit #13, indicated the incident was October 31, 2009, which was a Saturday. While the exact date may be unclear given the record, the Court is convinced that the incident did occur on either Saturday or Sunday, October 31, 2009, or November 1, 2009.
[31] The Reports were headed "Confidential Report of Incidents."
[32] (Tr. Nov. 5, 2009, p. 15 line 12 through p. 16 line 8.)
[33] The word "bollixed" meaning bungled, confused or botched, appears several times within the Mental Health Advocate's argument on November 5, 2009; see p. 13 lines 20 and 22. Seealso p. 6 line 10. The entire argument is set forth beginning on p. 4 line 1 through p. 22 line 6.
[34] See John 18:38, "New American Bible."
[35] Oscar Wilde, The Importance of Being Earnest, 1895, Act I, Irish dramatist, novelist, poet (1854 — 1900)